**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-CV-68 HEA |
| | ) | |
| PAULINE MAGIN, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:24-CV-41 HEA |
| | ) | |
| PIERSON BEAULIEU, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on a number of motions. In these two consolidated cases, Plaintiff BNSF Railway Company ("BNSF") moves for summary judgment and seeks to enforce arbitration agreements against all the remaining defendants. (ECF No. 229). Defendants Tiffany Powers, Pauline Magin, N.N., Ruth Sanborn, Dustin Boyd, Joseph Disciacca, Todd Covington, Wendy Burkett, Susan Juarez-Mora, and A.J.M (collectively "the Powers Defendants") move for the entry of summary judgment arguing that they did not consent to

arbitration. (ECF No. 247). Defendants Elijah Awe, Jonathan Awe, Harrison Boardman, Julian Boardman, and I.A. (collectively the "Awe Defendants") filed a separate motion for summary judgment arguing that they did not consent to arbitration. (ECF No. 251).  The following defendants filed a motion for summary judgment in which they argue the delegation clause in the arbitration agreement at issue is invalid, and any arbitration agreement between the parties is unconstitutional: Defendants A.J.M., Elijah Awe, Jonathan Awe, Pierson Beaulieu, Harrison Boardman, Julian Boardman, Dustin Boyd, Wendy Burkett, Todd Covington, Nicolas Dehoyos, Joseph Disciacca, I.A., Susan Juarez-Mora, Pauline Magin, N.N., Tiffany Powers, Angelika Salazar, and Ruth Sanborn.[1]  (ECF No. 250). BNSF also moves to exclude the defendants' retained experts, Professor Allen Rostron and Professor Jasmine Abdel-khalik.[2]  (ECF No. 242).  For the reasons that

---

[1]The following defendants have been dismissed from these two consolidated causes of action: Defendants Pauline Magin on behalf of all Wrongful Death Beneficiaries for the death of Kim Holsapple, Tiffany Powers on behalf of all Wrongful Death Beneficiaries for the death of Rachelle Cook, deceased, Pauline Magin on behalf of all Wrongful Death Beneficiaries for the death of Rachelle Cook, deceased, Brent Powers, William Magin, Shaun Phan on behalf of all Wrongful Death Beneficiaries for the death of Binh Phan, Vui Nguyen on behalf of all Wrongful Death Beneficiaries for the death of Binh Phan, Shaun Phan as an individual, A.P., Vui Nguyen as an individual, Ngoc Pham, Dung Pham, Ngoan Pham, Vy Pham, Thanh Le, Thinh Mai, A.M., A.M., Estevan Carreon, Jane Carreon, Tami Lakey, A.L., Allen Gallaway, Noel Lucero, Sherri Schwanz, Laura Rojas, and Deborah Wynne.

[2]On March 17, 2026, BNSF filed a motion requesting oral argument on the parties' motions for summary judgment. (ECF No. 286).  The Court does not require a hearing to decide the motions pending before it, and BNSF's motion for oral argument is denied.  Also pending before the Court is BNSF's Motion for Protective Order.  (ECF No. 216).  BNSF seeks to limit the deposition topics set forth in Defendants' Deposition Notice for BNSF's Rule 30(b)(6) corporate representative. Defense counsel took a corporate representative deposition for Amtrak, (ECF No. 247, Ex. 3), but

2

follow, the Court grants BNSF's Motion to Exclude Defendants' Experts, and it grants in part and denies in part BNSF's Motion for Summary Judgment. The Court grants the Awe Defendants' Motion for Summary Judgment, and it denies the Power Defendants' Motion for Summary Judgment. The Court denies Defendants' Motion for Summary Judgment as to Delegation and Constitutionality.

## I.    *Background*

These two consolidated cases stem from a train derailment involving a National Railroad Passenger Corporation ("Amtrak") train that occurred on June 27, 2022, on BNSF's track near Mendon, Missouri. A number of individuals, who were passengers or the heirs of passengers, brought lawsuits against BNSF, Amtrak, and MS Contracting, LLC in state court asserting state law tort claims. It is BNSF's position that many, if not all, of the state law claims against it are subject to an arbitration agreement, and it seeks to compel arbitration. BNSF, however, did not move to compel arbitration in state court, and it did not remove the state court cases to federal court. Instead, BNSF filed in this District two separate causes of action against different sets of plaintiffs from the state court lawsuits. In the two causes of

---

it is unclear from the record if the parties proceeded with a BNSF corporate representative deposition. Following BNSF's motion for the protective order, BNSF filed a motion for summary judgment, and Defendants responded to the motion and filed their own motions for summary judgment. Neither side has indicated that they have been unable to "present facts essential to justify [their] opposition" to the motions for summary judgment, nor have they requested that they be allowed to take additional discovery. Fed. R. Civ. P. 56(d). As the motions for summary judgment are dispositive as to all issues before the Court, BNSF's Motion for Protective Order will be denied as moot.

3

action, BNSF seeks to compel arbitration of the claims in the state court suits pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*. The state court lawsuits remain pending in state court and have not been stayed.

In *BNSF Railway Company v. Magin, et al.*, No. 2:22-CV-68 HEA ("*Magin*"), BNSF filed suit against 32 individuals (the "*Magin* Defendants"), who had filed eight separate lawsuits in state court.[3] (*Magin* ECF No. 102).   BNSF later filed a separate suit, *BNSF Railway Company v. Beaulieu, et al.*, No. 2:24-CV-41 HEA ("*Beaulieu*"), against 13 additional individuals. The 13 defendants are plaintiffs in 6 different lawsuits in state court.[4]   (*Beaulieu* ECF No. 1).   BNSF moved to consolidate *Magin* and *Beaulieu*. After careful review of the parties' briefs and the record in both cases, the Court found that the cases involved common issues of law and fact, and the cases were consolidated under the above-captioned case heading.

In both cases, BNSF alleges that the defendants all entered into Amtrak's Arbitration Agreement when they either purchased train tickets or had tickets

---

[3]The state court actions in *Magin* include Nos. 22CH-00021, 22CH-CC00022, 22CH-CC00024, 22CH-CC00026, 22CH-CC00029, 22CH-CC00038, 23CH-CC00004, and 23CH-CC00014. [*Magin* ECF No. 102 at 12-13]. Six of the original 32 *Magin* Defendants remain in this consolidated suit, and they are the following individuals:  Pauline Magin, Angelika Salazar, N.N., Tiffany Powers, Kimberly Howard, and Ruth Sanborn.

[4]These state court actions include the following cases: Nos. 22CH-CC00033, 23CH-CC00029, 24CH-CCCC00013, 24CH-CC00014, 24CH-CC00015, and 24CH-CC00016. [*Beaulieu* ECF No. 1 at 4 nn.2-4, 5 nn.7-8, 6 n.10].  The original 13 *Beaulieu* Defendants remain, and they are the following individuals: Defendants Pierson Beaulieu, Dustin Boyd, Wendy Burkett, Joseph Disciacca, Todd Covington, Nicolas Dehoyos, Susan Juarez-Mora, A.J.M., Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman.

4

purchased on their behalf.  BNSF contends that the defendants' claims against it in state court are subject to Amtrak's Arbitration Agreement, under which BNSF asserts that it is a third-party beneficiary. BNSF seeks an order compelling arbitration of all the defendants' claims against it pursuant to 9 U.S.C. § 4 of the FAA. BNSF also requests that the Court preclude the defendants from pursuing their state court actions while the parties arbitrate their disputes.

The matter is now before the Court on four cross motions for summary judgment and a motion to exclude expert testimony. The Court will first address BNSF's motion to exclude the defendants' two experts.  The Court will then take up the summary judgment motions, which are motions in support of and in opposition to compelling arbitration.  The Court will address contract formation, including whether BNSF is a third-party beneficiary that is entitled to enforce Amtrak's Arbitration Agreement, and whether each individual defendant consented to and is subject to the Arbitration Agreement.  Finally, the Court will address the defendants' arguments regarding constitutionality, arbitrability, and the delegation provision.

## II.    Motion to Exclude Experts

BNSF moves pursuant to Rule 702 of the Federal Rules of Evidence to exclude the opinions of Defendants' disclosed experts, Allen Rostron and Jasmine Abdel-khalik, both of whom are law school professors.  BNSF argues that the opinions of the two professors should be excluded as improper legal conclusions.

5

BNSF has submitted the experts' reports and other exhibits.  The Court finds that it can make a proper *Daubert* determination without the need for an evidentiary hearing or oral argument.  *Miller v. Baker Implement Co.*, 439 F.3d 407, 412 (8th Cir. 2006) (district court need not hold a *Daubert* hearing where parties have opportunity to present argument and evidence before ruling on the motion).

## A.     Legal Standard

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  The proponents of the expert testimony in question, here the defendants, have the burden to prove its admissibility by a preponderance of the evidence.  *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021).  *See also* Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule.") (citing Fed. R. Evid. 104(a)).

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts are "vested with a gatekeeping function, ensuring that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Union Pac. R. Co. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 709 (8th Cir. 2015) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). To carry out this gatekeeping function, the Court must ensure that the proposed expert testimony meets three prerequisites in order to be admissible. First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. In other words, the evidence must be relevant. *Lauzon*, 270 F.3d at 686 (citing 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[3] (2001)). Second, "the proposed witness must be qualified to assist the finder of fact." *Id.* Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Id. See also Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010); *Khoury v. Philips Med. Sys.*, 614 F.3d 888 (8th Cir. 2010). "[D]oubts regarding whether an expert's

7

testimony will be useful should generally be resolved in favor of admissibility."

*Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 954 (8th Cir. 2000) (quotation

omitted).

### B.    Discussion

Defendants have designated University of Missouri – Kansas City ("UMKC")

Law Professor Allen Rostron to offer an opinion "on whether Amtrak is a

governmental entity, for constitutional purposes, when it sells tickets to passengers."

(ECF No. 242, Ex. 2 at 2).  In his report, Professor Rostron concludes that "[i]t is

[his] opinion, based on a reasonable degree of certainty as a constitutional scholar,

that Amtrak is engaged in government action, for constitutional purposes, when it

conducts its activities, and those activities would include selling tickets to train

passengers." (*Id.*)  Professor Rostron reached his conclusion by considering the Rail

Passenger Service Act of 1970 and other general characteristics of Amtrak, and by

examining and applying case law from the United States Supreme Court to the facts

and circumstances of these two consolidated cases. In support of his opinion,

Professor Rostron also cites other cases from federal courts across the country.

Defendants have also designated UMKC Law Professor Jasmine Abdel-

khalik  to offer an opinion as to "whether the facts as to the structure of the terms,

complexity of the language, punctuation as well as the factual manner in which the

Amtrak's Arbitration Agreement and its delegation clause were made available to

8

the passengers, if at all, speaks to the validity and scope of those alleged agreements." (ECF No. 242, Ex. 3 at 1).  Professor Abdel-khalik states in her report: "I have examined Amtrak's Arbitration Agreement and delegation clause and, in my opinion, have identified issues with contract interpretation, enforceability, and formation." (*Id.* at 3).  Like Professor Rostron, Professor Abdel-khalik based her opinion on case law.  In her report, she offers a number of opinions such as whether the language of Amtrak's Arbitration Agreement, and more specifically its delegation clause, is ambiguous, and whether the delegation clause is unenforceable or invalid as unconscionable.  She also offers opinions as to whether the various passengers formed a contract with Amtrak.  In reaching her conclusions, she examined the law of agency and legal principles of actual and apparent authority.  In her report, Professor Abdel-khalik cites over two dozen cases, as well as restatements of law, law reviews, and Black's Law Dictionary.

Under Rule 702, expert testimony is admissible to help "the trier of fact to understand the evidence or to determine a fact." Fed. R. Evid. 702. Expert testimony offering legal opinions is not admissible, because matters of law are for the Court to decide. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *United States v. Klaphake*, 64 F.3d 435, 438–39 (8th Cir. 1995); *Am. Mod. Home Ins. Co. v. Thomas*, No. 4:16-CV-215 CDP, 2018 WL 4404723, at *7 (E.D. Mo. Sept. 17, 2018).  When expert opinions are little more than legal

9

conclusions, there is no abuse of discretion in excluding such statements. *In re Acceptance Ins. Companies Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005). *See also Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989) (stating there is "no doubt" that a "district court act[s] properly in ruling that [an] . . . expert witness [cannot] testify regarding the requirements of law."); *Thomas v. State Farm Mut. Auto. Ins. Co.*, 712 F. Supp. 3d 1229, 1233 (E.D. Mo. 2024) (excluding attorney who "formed the opinions in her report by applying her knowledge of the law to the facts of the case, which is not allowed"); *American Modern Home Ins. Co.*, 2018 WL 4404723 at *7 (noting that an expert "may not intrude on the Court's role to instruct the jury as to the law and testify to a legal conclusion").

Professors Rostron and Abdel-khalik are legal experts, who are being offered to provide their legal opinions regarding a number of legal issues in dispute in these two consolidated cases. They are not being offered to assist a factfinder in understanding a disputed fact.

With regard to Professor Rostron, Defendants argue that his opinion – that Amtrak is engaged in a government action for constitutional purposes when it sells tickets – is based on a review of the facts.  But whether Amtrak is engaged in a government action for purposes of the Constitution is a legal conclusion, and Defendants admit that Professor Rostron relied extensively on cases from the

10

Supreme Court in reaching his conclusion. They argue that "he review[ed] those cases, not for their legal principles, but for their rendition of similar facts essential to answering the question posed by this Court and for the way that the Court treated those facts." (ECF No. 260 at 9).  In other words, Professor Rostron formed his opinion by looking for legal precedent, and he then applied his knowledge of the law to the facts. This is legal reasoning and analysis. Roscoe Pound, *An Introduction to Legal Reasoning*, 60 Yale L.J. 193, 195 (1951).  The Court finds that Defendants are offering Professor Rostron to provide legal opinion, contrary to  Rule 702. *Cowden v. BNSF Ry. Co.*, 980 F. Supp. 2d 1106, 1118 (E.D. Mo. 2013) ("Although expert witnesses may embrace an ultimate issue in their testimony, they may not state legal standards or draw legal conclusions by applying law to the facts.") (citation omitted). Professor Rostron will be excluded as an expert witness.

As for Professor Abdel-khalik, Defendants argue that her expert opinion is being offered to assist the Court in understanding how a consumer might understand Amtrak's Arbitration Agreement. According to Defendants, Professor Abdel-khalik examined the Arbitration Agreement's terms, language, and punctuation and then formed opinions regarding "what these facts say about the validity and scope of [the Arbitration Agreement]." (ECF No. 260 at 4) (cleaned up).  Defendants contend that most of her report focusses on the language of the Arbitration Agreement and more specifically, the supposed delegation provision.  They argue her opinions are

11

not legal conclusions "even if she occasionally invoked legal terminology or cited supported caselaw in footnotes."  (*Id.* at 6).

Defendants' characterization of Professor Abdel-khalik's report is not accurate.  Professor Abdel-khalik does more than "occasionally" reference legal terminology or cases.  She applies the facts of the case – which does include the language of the Arbitration Agreement – to what she considers to be relevant case law. She offers opinions on a number of legal issues involved in this dispute including the following: whether Amtrak's Arbitration Agreement is ambiguous; whether it is unconscionable; whether there was mutual assent; whether a contract was formed; if a contract was formed, what are its terms; and whether the defendant passengers can be bound by the actions of persons who bought tickets for them. (ECF No. 242, Ex. 3 at *passim*).

Contract formation, interpretation, and construction are legal issues to be determined by the Court.  *Pac. Life Ins. Co. v. Blevins*, 92 F.4th 734, 737 (8th Cir. 2024) ("[t]he interpretation of a contract is a question of law."); *Food Mkt. Merch., Inc. v. Scottsdale Indem. Co.*, 857 F.3d 783, 787 (8th Cir. 2017) ("[w]hether a contract is ambiguous is a question of law."); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003) (holding the "construction" of a contract – "the process of determining its legal effect – is a question of law for the court.").  Like Professor Rostron, Professor Abdel-khalik formed her opinions

by applying her knowledge of the law to the facts of the case, which is legal reasoning. Professor Abdel-khalik is not being offered to assist a trier-of-fact in understanding a disputed fact, but rather Defendants seek to introduce Professor Abdel-khalik's legal opinions, which is not allowed.  *Cowden*, 980 F. Supp. 2d at 1118.

BNSF's Motion to Exclude the Opinions of Professors Rostron and Abdel-khalik is granted.  The Court declines to consider the legal opinions of these two law professors in deciding the legal issues presented in the parties' motions for summary judgment.

### III.    *Motions for Summary Judgment*

There are four motions for summary judgment pending before the Court. BNSF moves for summary judgment and asks that the Court compel the remaining defendants to submit to arbitration. The Powers Defendants and the Awe Defendants filed two separate motions for summary judgment arguing that they did not consent to the Arbitration Agreement. Finally, several of the remaining defendants in these two consolidated cases filed a motion for summary judgment arguing that the delegation clause contained in the Arbitration Agreement is invalid, and that Amtrak's Arbitration Agreement is unconstitutional.

BNSF files suit under the FAA.  The FAA applies to contracts evidencing transactions "involving commerce." 9 U.S.C. § 2; *Hoffman v. Cargill Inc.*, 236 F.3d 458, 461 (8th Cir. 2001).  The statute provides:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The Supreme Court has interpreted this provision broadly as exercising the full scope of Congress's commerce-clause power.  *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273–77 (1995).

Under the FAA:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

"Arbitration is a matter of contract and consent," and "disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024); *see also Foster v. Walmart, Inc.*, 15 F.4th 860, 862 (8th Cir. 2021).  Because arbitration agreements are a matter of

contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (*quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)) (internal marks omitted). The district court's role under the FAA is limited to deciding whether the parties agreed to arbitration and whether the agreement encompasses the dispute at issue. *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). Thus, the Court must determine whether BNSF has established that there is an arbitration agreement between it and each of the defendants in these two consolidated cases.

In determining whether the parties agreed to arbitrate, the Court applies "state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "State contract law governs whether an arbitration agreement is valid." *Lyster v. Ryan's Fam. Steak Houses, Inc.*, 239 F.3d 943, 946 (8th Cir. 2001).

"The FAA does not expressly identify the evidentiary standard a party seeking to avoid compelled arbitration must meet." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The Eighth Circuit has instructed that "Rule 12(b)(6) or Rule 56 motions are the appropriate means for parties seeking to compel arbitration." *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018) (citing *City of Benkelman, Nebraska v. Baseline Eng'g Corp.*, 867 F.3d 875, 881 (8th Cir. 2017)). Where, like

here, the parties rely on matters outside the pleadings, "a summary judgment standard – viewing the evidence and resolving all factual disputes in the nonmoving party's favor – should [ be] used to evaluate the motions." *Nebraska Mach. Co. v. Cargotec Sols., LLC,* 762 F.3d 737, 742 (8th Cir. 2014).

## A. Legal Standard

The standard applicable to summary judgment motions is well-settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings but by affidavit and other evidence must set forth specific facts

16

showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1029 (8th Cir. 2000); *Allen v. Entergy Corp.*, 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Herring*, 207 F.3d at 1029 (quoting *Anderson*, 477 U.S. at 248). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact, *see Crossley v. Georgia-Pac. Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004), and "must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). With this standard in mind, the Court accepts the following facts as true.

### B. Undisputed Facts

Amtrak provides intercity passenger rail service across the United States. Amtrak, however, does not own the railroad tracks over which it operates throughout most of its network. Amtrak enters into agreements with other railroad companies, including BNSF, to operate over their tracks. The railroads on which Amtrak operates are designated as host railroads.

On September 1, 1996, BNSF and Amtrak entered into an agreement that allows Amtrak to operate trains on BNSF's tracks (the "Operating Agreement"). Under the Operating Agreement, BNSF acts as a host railroad for Amtrak and permits Amtrak to operate its trains over BNSF's tracks. Further, in exchange for the use of BNSF's tracks, Amtrak agreed under the Operating Agreement to indemnify BNSF against claims arising from Amtrak's operations over BNSF's tracks.

On June 27, 2022, Amtrak Train 4, also known as the Southwest Chief, derailed in Chariton County, Missouri.  The train was traveling on tracks owned by BNSF.   Defendants Tiffany Powers, Pauline Magin, Angelika Salazar, Minor N.N., Kimberly Howard, Ruth Sanborn, Pierson Beaulieu, Dustin Boyd, Wendy Burkett, Joseph Disciacca, Todd Covington, Nicolas Dehoyos, Susan Juarez-Mora, Minor A.J.M., Jonathan Awe, Minor I.A., Elijah Awe, Julian Boardman and Harrison Boardman were passengers on Amtrak Train 4. These 19 defendants sued BNSF and Amtrak in the Circuit Court of Chariton County, Missouri, each claiming damages for personal injuries arising from the derailment.

BNSF did not remove the individual cases pending in Chariton County to this Court, but rather it filed two separate causes of action, *Magin* and *Beaulieu*, and in each of these causes of action, BNSF joined multiple plaintiffs from multiple cases pending in the state court as defendants.  In the two consolidated cases, BNSF seeks

18

to enforce arbitration. That is, it seeks to have these Defendants' state court claims against BNSF resolved in arbitration.

BNSF moves to enforce an arbitration agreement, however, it is undisputed that none of the defendants directly contracted with BNSF. Rather BNSF contends that each of the defendants entered into the Arbitration Agreement with Amtrak when their tickets were purchased from Amtrak.  BNSF further argues that under the terms of the Arbitration Agreement, it is a beneficiary that is entitled to enforce the agreement.

For purposes of resolving this dispute, Amtrak train tickets can be purchased over the phone, at an Amtrak ticketing counter, or through the internet on Amtrak's website and mobile apps. When a customer purchases a train ticket from Amtrak through its website or mobile apps, customers are presented with a purchase screen and an acknowledgement click-box that states: "I have read and agree to the terms and conditions, including the binding arbitration agreement." (ECF No. 274 at 5). The click-box also includes language about COVID restrictions.  In the click-box, the phrase "terms and conditions" is written in blue text and contains a link to Amtrak's Terms and Conditions, which can be found at https://www.amtrak.com/terms-and-conditions.html. To access the link to the "terms and conditions" from the click-box, a customer must hover their cursor over the phrase "terms and conditions" and then click the phrase to open the link. The

19

click-box is displayed on the payment page where a customer supplies their payment card information. When presented with the acknowledgement click-box, the customer has already entered the traveler's information including name, address, and email address.

At the time of an online or mobile app purchase, Amtrak sends an automatic email receipt to the email address that the purchaser provided.  The email states that "This ticket is a contract of carriage which includes specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The terms and conditions and arbitration agreement are available at Amtrak.com/terms-and-conditions.html." (ECF No. 230 at 4).   The term "Amtrak.com/terms-and-conditions.html" is underlined and written in blue font and contains a link directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html. (*Id.*)

On the top of Terms and Conditions webpage, there is a notice that states:

> These terms and conditions contain a binding Arbitration Agreement below. Please read the Arbitration Agreement carefully because it applies mutually to You and Amtrak and requires that you resolve claims and disputes with Amtrak on an individual basis through arbitration and not by way of court or jury trial. By purchasing a ticket for travel on Amtrak, You are agreeing to these terms and conditions and agreeing to the Arbitration Agreement.

(*Id.*) The words "Arbitration Agreement below" are underlined and in blue font, and

they contain a link directly to the provisions in the Terms and Conditions concerning

arbitration, which include the following:

> Mutual Agreement to Arbitrate ("Arbitration Agreement"). This Arbitration Agreement is intended to be as broad as legally permissible, and, except as it otherwise provides, applies to all claims, disputes, or controversies, past, present, or future, that otherwise would be resolved in a court of law or before a forum other than arbitration. Amtrak and Customer (on behalf of yourself and any individuals for whom you purchase tickets, including, without limitation, family members, minor passengers, colleagues and companions (collectively "You" or "Your"), AGREE that this Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad, based upon or related to: these Terms and Conditions, breach of contract, tort claims, common law claims, Your relationship with Amtrak, tickets, services and accommodations provided by Amtrak, carriage on Amtrak trains and equipment, any personal injuries (including, but not limited to, claims for negligence, gross negligence, physical impairment, disfigurement, pain and suffering, mental anguish, wrongful death, survival actions, loss of consortium and/or services, medical and hospital expenses, expenses of transportation for medical treatment, expenses of drugs and medical appliances, emotional distress, exemplary or punitive damages arising out of or related to any personal injury), and any claims for discrimination and failure to accommodate, which shall be decided by a single arbitrator through binding arbitration and not by a judge or jury. Except with respect to the Class Action Waiver below, the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability and enforceability, unconscionability or waiver of this Arbitration Agreement, including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable. The Arbitration Agreement is governed by the Federal Arbitration Act ("FAA") and evidences a transaction involving commerce. The arbitration will be

21

conducted before a single arbitrator under Consumer Arbitration Rules of the American Arbitration Association ("AAA"), which are available at the AAA website (www.adr.org). A court of competent jurisdiction shall have the authority to enter judgment upon the arbitrator's decision/award. The parties agree to bring any claim or dispute in arbitration on an individual basis only, and not as a class or representative action, and there will be no right or authority for any claim or dispute to be brought, heard or arbitrated as a class or representative action ("Class Action Waiver"). Regardless of anything else in this Arbitration Agreement and/or the applicable AAA Rules, any dispute relating to the interpretation, applicability, enforceability or waiver of the Class Action Waiver may only be determined by a court and not an arbitrator. This Arbitration Agreement does not apply to any claim or dispute that an applicable federal statute states cannot be arbitrated.

(ECF No. 274 at 13-14)

Passengers cannot board and travel on Amtrak trains without presenting a ticket to a conductor. Individuals who travel together may purchase their tickets together, and in such instances, there will be one ticket that is presented to a conductor for all the passengers traveling together.

All the remaining defendants in these two consolidated cases were passengers on the Amtrak Train 4 on June 27, 2022, but they used various methods to purchase or acquire their train tickets.

<u>Kimberly Howard</u>

On April 12, 2022, Kimberly Howard purchased a ticket to travel on Amtrak Train 4 utilizing the internet. During the online transaction, Kimberly Howard affirmatively clicked a box stating that she had read and agreed to Amtrak's Terms

22

and Conditions, which included the Arbitration Agreement.  On April 12, 2022, an automated Amtrak e-mail receipt was sent to Kimberly Howard's email address advising that her ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder.  The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html. Kimberly Howard used her ticket to board Train 4, and an Amtrak conductor "lifted" or scanned the train ticket on June 27, 2022, at 9:22 a.m. in Kansas City, Missouri.

Nicolas Dehoyos

On June 18, 2022, Nicolas Dehoyos purchased a ticket to travel on Amtrak Train 4 utilizing the internet. During the online transaction, Nicolas Dehoyos affirmatively clicked a box stating that he had read and agreed to Amtrak's Terms and Conditions, which included the Arbitration Agreement. On June 18, 2022, an automated Amtrak e-mail receipt was sent to Nicolas Dehoyos advising that his ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html.  Nicolas Dehoyos used his

23

ticket to board Train 4, and an Amtrak conductor "lifted" or scanned the train ticket on June 25, 2022, at 6:07 p.m. in Los Angeles, California.

Angelika Salazar and N.N.

On June 17, 2022, Angelika Salazar purchased tickets for her and her minor son, N.N., to travel on Amtrak Train 4 utilizing the internet. During the online transaction, Angelika Salazar affirmatively clicked a box stating that she had read and agreed to Amtrak's Terms and Conditions, which included the Arbitration Agreement. On June 17, 2022, an automated Amtrak e-mail receipt for the train tickets for passengers Angelika Salazar and N.N. was sent to Angelika Salazar's email address indicating that the tickets included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holders. The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html. Angelika Salazar and N.N. used their tickets to board Train 4, and an Amtrak conductor "lifted" or scanned the train tickets on June 25, 2022, at 7:49 p.m. and 7:50 p.m. in San Bernardino, California.

Pierson Beaulieu

On June 9, 2022, Pierson Beaulieu purchased a ticket to travel on Amtrak Train 4 using Amtrak's mobile app. During the online transaction, Pierson Beaulieu affirmatively clicked a box stating that she had read and agreed to Amtrak's Terms

24

and Conditions, which included the Arbitration Agreement. On June 9, 2022, the automated Amtrak e-mail receipt was sent to Pierson Beaulieu advising that the ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html. Pierson Beaulieu used her ticket to board Train 4, and an Amtrak conductor "lifted" or scanned the train ticket on June 27, 2022, at 9:27 a.m. in Kansas City, Missouri

Pauline Magin and Tiffany Powers

On May 5, 2022, Kim Holsapple utilized the internet to purchase tickets for Pauline Magin and Tiffany Powers to travel on Amtrak Train 4. During the online transaction, Ms. Holsapple affirmatively clicked the box stating that she had read and agreed to Amtrak's Terms and Conditions, which included the Arbitration Agreement. On May 5, 2022, an automated Amtrak e-mail receipt for the train tickets for Pauline Magin and Tiffany Powers was sent to Ms. Holsapple advising that the tickets included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holders. The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html. On

25

Wednesday, June 1, 2022, Ms. Holsapple texted Tiffany Powers requesting reimbursement for the cost the train ticket via Venmo.

Pauline Magin and Tiffany Powers used their tickets to board Train 4, and an Amtrak conductor "lifted" or scanned the train tickets on June 27, 2022, at 9:25 a.m. in Kansas City, Missouri. Pauline Magin and Tiffany Powers attest that they were never in possession of their tickets. They also attest that they did not authorize anyone purchasing their tickets to agree to arbitration on their behalf.

Dustin Boyd

On May 18, 2022, Dustin Boyd's co-worker purchased, using the Amtrak mobile app, a ticket for Dustin Boyd to travel on Amtrak Train 4. During the online transaction, the co-worker affirmatively clicked a box stating that he had read and agreed to Amtrak's Terms and Conditions, which included the Arbitration Agreement. On May 18, 2022, an automated Amtrak e-mail receipt was sent to Dustin Boyd's co-worker's email address advising that the ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html. Dustin Boyd used his ticket to board Train 4. While Dustin Boyd attests that he was never in personal possession of a ticket in electronic or printed form, an Amtrak conductor "lifted" or scanned

26

Dustin Boyd's ticket on Train 4 at 9:14 a.m. on June 27, 2022, in Kansas City. Dustin Boyd attests that he did not authorize his co-worker to agree to arbitration on his behalf.

<u>Ruth Sanborn</u>

On June 23, 2022, Ruth Sanborn's friend, Seyedreza Sheykholeslami purchased, using the internet, a ticket for her to travel on Amtrak Train 4. During the online transaction, Mr. Sheykholeslami affirmatively clicked the box stating that he had read and agreed to Amtrak's Terms and Conditions, which included the Arbitration Agreement. On June 23, 2022, an automated Amtrak e-mail receipt was sent to Ruth Sanborn's email address advising that the ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html. Ruth Sanborn used her ticket to board Train 4, and an Amtrak conductor "lifted" or scanned the train ticket on June 25, 2022 at 6:42 p.m., in Los Angeles, California. Ruth Sanborn attests that she did not authorize Mr. Sheykholeslami to agree to arbitration on her behalf.

<u>Joe Disciacca</u>

On May 26, 2022, a ticket to travel on Amtrak Train 4 was purchased on behalf of passenger Joe Disciacca using the internet. During the online transaction,

27

the purchaser of the ticket clicked the box stating that they had read and agreed to Amtrak's Terms and Conditions, which included the Arbitration Agreement. On May 26, 2022, an automated Amtrak e-mail receipt was sent to the purchaser of the ticket advising that the ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder.  The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html.  Joe Disciacca used the ticket to board Train 4, and an Amtrak conductor "lifted" or scanned the ticket on June 27, 2022, at 9:26 a.m. in Kansas City. Joe Disciacca attests that he did not authorize anyone purchasing his ticket to agree to arbitration on his behalf.

<u>Wendy Burkett</u>

Wendy Burkett was a passenger on Train 4, however, she attests that she did not have any communication with Amtrak about her train ticket other than when she approached the ticket window on June 27, 2022, to pick up her ticket prior to departure.  BNSF, however, presented evidence that on June 1, 2022, a ticket to travel on Amtrak Train 4 from Kansas City to Chicago, departing June 27, 2022, was purchased on Wendy Burkett's behalf using the Amtrak mobile app.  Wendy Burkett states that she does not recall accessing the internet to purchase a train ticket, but she admits to this fact.  (ECF No. 274 at 21). During the online transaction,

28

Wendy Burkett, or someone who was purchasing the ticket on her behalf, clicked a box stating that they had read and agreed to Amtrak's Terms and Conditions, which included the Arbitration Agreement. On June 1, 2022, an automated Amtrak e-mail receipt was sent to Wendy Burkett's email address advising that the ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder.  The e-mail receipt contained a link directly to the Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html.  Wendy Burkett used her ticket to board Train 4, and an Amtrak conductor "lifted" or scanned the ticket on June 27, 2022, at 9:18 a.m. in Kansas City. Wendy Burkett attests that she did not authorize anyone purchasing her ticket to agree to arbitration on her behalf.

<u>Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman</u>

Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman were passengers on Amtrak Train 4 on June 27, 2022.  Elijah Awe, I.A., and Harrison Boardman were Boy Scouts in Crew 1273, and all three were minors on June 27, 2022. Elijah Awe and I.A. are Jonathan Awe's sons.  Harrison Boardman is Julian Boardman's son.  Jonathan Awe and Julian Boardman were adult leaders for Crew 1273.

In January 2022, another adult leader of Crew 1273, Craig Thoms, contacted the Group Sales department at Amtrak by telephone to book travel for the group.[5] Mr. Thoms purchased train tickets over the phone for Jonathan Awe, I.A., Elijah Awe, Julian Boardman, and Harrison Boardman from Raton, New Mexico to Milwaukee, Wisconsin.  An arbitration agreement was not mentioned or discussed on the phone.

On January 14, 2022, Amtrak sent Mr. Thoms a Group Travel Confirmation Letter that stated, "Transportation on Amtrak is subject to the terms and conditions on your ticket and associated ticket jacket. Additional terms and travel information can be found on Amtrak.com." (ECF No. 230 at 11).  The Confirmation Letter did not refer to an arbitration agreement.

Prior to their travel, Amtrak sent Mr. Thoms by mail one ticket and one ticket jacket for the group of ticket holders.  The following was written on the ticket jacket in extremely small print: "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL." (ECF No. 274 at 29).  The ticket jacket contains no statement about what was

---

[5]From the record, it appears that Craig Thoms was a passenger on Train 4 on June 27, 2022, although he is not a defendant in either of these two consolidated causes of action.

included in those terms and conditions, including the fact that such terms and conditions contained an arbitration provision.  Below is a copy of the ticket jacket that was filed with the Court:

(ECF No. 251, Ex. 4 at 16).

Mr. Thoms showed the ticket to an Amtrak conductor when the group boarded the Train 4 on June 27, 2022, and he kept possession of that ticket.  Jonathan Awe and Julian Boardman were never in possession of the group ticket.  Jonathan Awe attests that he did not authorize anyone, including Craig Thoms, to agree to arbitration on his behalf or on behalf of his sons, Elijah and I.A.  Julian Boardman attests that he did not authorize anyone, including Craig Thoms, to agree arbitration on his behalf or on behalf of his son, Harrison Boardman.

31

<u>Susan Juarez-Mora and A.J.M.</u>

Susan Juarez-Mora purchased train tickets for her and her minor daughter, A.J.M., through an automated agent over the phone.  Susan Juarez-Mora provided her email address and on June 22, 2022, an automated Amtrak e-mail receipt for the train tickets for passengers Susan Juarez-Mora and A.J.M. was sent to Susan Juarez-Mora's email address indicating that the tickets included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holders. The e-mail receipt contained a hyperlink that when clicked went directly to Amtrak's Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html.  Susan Juarez-Mora and A.J.M. used their tickets to board Train 4, and an Amtrak conductor "lifted" or scanned the train tickets on June 26, 2022, at 12:22 p.m. in Albuquerque, New Mexico.

<u>Todd Covington</u>

Todd Covington was a passenger on Train 4 on June 27, 2022, but the parties dispute about how he purchased his ticket.  Todd Covington points to evidence that he purchased his ticket over the phone.  (ECF No. 275 at 33).  BNSF disputes this fact, (ECF No. 280 at 94), and has produced a document contending it demonstrates that Todd Covington purchased his ticket over the internet, and that during the online transaction, he clicked a box accepting Amtrak's Terms and Conditions, including

the Arbitration Agreement.  It is undisputed that Todd Covington supplied Amtrak with his email address, and at some point, after his ticket was purchased but before he boarded the train, an automated Amtrak e-mail receipt was sent to his e-mail address advising that the ticket included specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket holder. The e-mail receipt contained a link directly to the Terms and Conditions, which may be found at https://www.amtrak.com/terms-and-conditions.html.  Todd  Covington  used  his ticket to board Train 4, and an Amtrak conductor "lifted" or scanned the ticket on June 27, 2022, at 9:26 a.m. in Kansas City.  Todd Covington attests that he did not authorize anyone purchasing his ticket to agree to arbitration on his behalf.

### C. Contract Formation

BNSF seeks to enforce Amtrak's Arbitration Agreement.  As the party seeking to enforce the agreement, BNSF must demonstrate that there is a valid arbitration agreement and that the parties each entered into the agreement.  The essential elements of a valid agreement are "the involvement of parties who are competent to contract, a proper subject matter, legal consideration, mutuality of obligation, and mutuality of agreement." *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006).

It is undisputed that none of the defendants entered into an agreement with BNSF. To the extent that they agreed to the Arbitration Agreement, the defendants

entered into an agreement with Amtrak.  The Court, therefore, must first determine whether BNSF can enforce Amtrak's Arbitration Agreement.  The Court will then examine whether each of the remaining defendants agreed to Amtrak's Arbitration Agreement.

     1.  *BNSF can enforce Amtrak's Arbitration Agreement as an intended, third-party beneficiary*.

BNSF asserts that it is a third-party beneficiary under the terms of Amtrak's Arbitration Agreement, and as a beneficiary of the Arbitration Agreement, it is entitled to enforce its terms.  The language of the Arbitration Agreement provides as follows:

> [T]his Arbitration Agreement applies, without limitation, to claims Amtrak may have against You and claims You may have against Amtrak and any affiliates or related entities, or against any party to which Amtrak owes indemnity (which party may also enforce this Agreement), including without limitation any host railroad…

(ECF No. 230 at 5).  BNSF has presented undisputed evidence that it owns the track over which Amtrak was operating at the time of the accident, and under the terms of BNSF and Amtrak's Operating Agreement, it is a host railroad.  BNSF further asserts that under the Operating Agreement, in exchange for the use of BNSF's tracks, Amtrak agreed to indemnify BNSF against claims arising from Amtrak's operations over BNSF's track.  BNSF contends that there can be no dispute that BNSF is a host railroad and as such, it may enforce the terms of Amtrak's Arbitration Agreement.  Defendants do not contest this, and the Court finds BNSF can enforce

34

Amtrak's Arbitration Agreement as it is a host railroad and a designated third-party beneficiary under its express terms.

As BNSF can enforce Amtrak's Arbitration Agreement, the Court must now determine whether each of the remaining defendants consented to its terms.

> 2. *Some of the remaining defendants did agree to Amtrak's Arbitration Agreement.*

BNSF maintains that all the remaining defendants in these consolidated cases consented to Amtrak's Arbitration Agreement through the purchase and use of their train tickets.  It is undisputed, however, that the remaining defendants used different methods to purchase their tickets.  The Court, therefore, must examine each of these methods of purchase to determine whether a contract to arbitrate was formed with each of the remaining defendants.

> a. *Defendants who purchased tickets themselves over the internet consented to Amtrak's Arbitration Agreement - Defendants Howard, Dehoyos, Salazar, and Beaulieu.*

It is undisputed that Kimberly Howard, Nicolas Dehoyos, Angelika Salazar and Pierson Beaulieu bought their own train tickets through the internet using Amtrak's website or mobile app. Further, BNSF presented undisputed evidence that Amtrak presented these four defendants with a text box indicating that the tickets were subject to Amtrak's Terms and Conditions, including the Arbitration Agreement.  There was a link in the text box that when clicked, it took users directly

35

to the Terms and Conditions.  There is also evidence that users were required to click the "accept" box to complete the transaction.

"Internet contracts, just like other agreements, require mutual assent between the parties – a so-called 'meeting of the minds.'" *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021). Companies use various methods to accomplish this, including "clickwrap" agreements, which is what is described above.  *Id.* ("[A] so-called 'clickwrap' arrangement requires the user to explicitly assent by clicking 'I agree' (or something similar) before using the website or purchasing a product."). *See also Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).

Courts across the country, including courts in Missouri, California, Florida, Indiana, and Kansas, have recognized that an electronic "click" can signify the acceptance of a contract, and they have enforced clickwrap agreements.[6] *Wakeman*

---

[6]Defendants are domiciled in various states across the country, but there is not enough information in the record for the Court to conduct a proper choice of law analysis for each of the remaining defendants in these consolidated cases. Missouri's choice-of-law rules govern in this dispute. *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012) ("In determining which state's law applies, we generally employ the forum state's choice-of-law rules."). And Missouri courts apply the most significant relationship test as set forth in Restatement (Second) of Conflict of Laws Section 188 when resolving choice of law issues. *Sheehan v. Northwestern Mut. Life Ins. Co.*, 44 S.W.3d 389, 396 (Mo. Ct. App. 2000). For contract claims, courts are to look to the following when determining which state has the most significant relationship to the transaction and parties: "'(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.'" *Viacom, Inc. v. Transit Cas. Co.*, 138 S.W.3d 723, 725 (Mo. 2004) (quoting Restatement (Second) of Conflict of Laws

36

*v. Uber Techs., Inc.*, 721 F. Supp. 3d 1191, 1196 (D. Kan. 2024) (enforcing clickwrap agreement under Kansas law); *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 939 (N.D. Cal. 2023) (enforcing clickwrap agreement under California law); *Perficient, Inc. v. Palfery*, No. 4:20-CV-618-MTS, 2022 WL 1102117, at *5 (E.D. Mo. Apr. 13, 2022) (enforcing clickwrap agreement under Missouri law); *Segal v. Amazon.com, Inc.*, 763 F. Supp. 2d 1367 (S.D. Fla. 2011) (enforcing clickwrap agreement under Florida law); *Jallali v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 908 N.E.2d 1168, 1174 (Ind. Ct. App. 2009) (enforcing clickwrap agreement under Indiana law). The Court finds that the undisputed evidence establishes that Defendants Howard, Dehoyos, Salazar, and Beaulieu agreed to Amtrak's Arbitration Agreement when they purchased their tickets over the internet through Amtrak's website or mobile apps.

---

section 188(2)). BNSF argues that there is no need for the Court to engage in a choice of law analysis "because the principles of contract formation are the same in every state." (ECF No 271 at 6) (citing *Phillips v. Marist Soc. of Washington Province*, 80 F.3d 274, 276 (8th Cir. 1996)). There is no national body of contract law, although the Court does agree that most states' laws concerning contract formation are rooted in common law and share basic similarities such as the requirements of offer, acceptance, consideration, and mutual assent. The Court, however, has found some nuances in the law, and it will address and resolve these nuanced differences when they arise in the subsections below.

b. *Defendants whose tickets were purchased by someone else over the internet are subject to the Amtrak Arbitration Agreement - Defendants Magin, Powers, Boyd, Sanborn, and Disciacca.*

It is undisputed that Defendants Pauline Magin, Tiffany Powers, Dustin Boyd, Ruth Sanborn, and Joseph Disciacca did not personally purchase their own train tickets. Instead, another person – a friend or co-worker – bought their train tickets on Amtrak's website or mobile apps.  During these online transactions, the friend or co-worker clicked the box indicating that they agreed to Amtrak's Terms and Condition, including its Arbitration Agreement.  Defendants Magin, Powers, Boyd, Sanborn, and Disciacca did not click the box indicating they agreed to Amtrak's Arbitration Agreement. In other words, these five defendants are non-signatories to the Arbitration Agreement, and the issue before the Court is whether these non-signatories can be bound by its terms.

Courts have recognized different theories under which non-signatories may be bound to agreements signed by others. *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005).  These theories are based in common law principles of contract and agency law. *Id.*  "Agency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Asa-Brandt, Inc. v. ADM Inv. Servs., Inc.*, 344 F.3d 738, 749 (8th Cir. 2003) (cleaned up and quotation omitted). "An agent's authority may be apparent, express or implied." *Id.*

38

An agent acts on actual authority if the principal has granted the agent authority to act on the behalf of the principal either expressly or by implication. *Id.* "Actual authority 'focuses on communications and contacts between the principal and the agent.'" *Id.* (quoting *AgriStor Leasing v. Farrow*, 826 F.2d 732, 738 (8th Cir. 1987). The five defendants all attest that they did not give anyone actual authority to enter into the Arbitration Agreement on their behalf.

BNSF argues that the Arbitration Agreement is enforceable against the non-signatory defendants under the doctrine of apparent authority. According to BNSF:

> Here, it is undeniable that the ticket purchases and acceptance of the terms and conditions were performed by purchasers acting within the scope of their apparent authority. Apparently [sic] authority existed for the purchasers to not only purchase the tickets but also accept the terms and conditions associated with the tickets including the Arbitration Agreement. Amtrak reasonably relied upon that apparent authority in issuing each of Defendants' tickets, and Defendants knowingly accepted the benefits of the tickets by using them.

(ECF No. 279 at 15).

Under the doctrine of apparent authority, no actual authority to act has been given to the supposed agent, but nonetheless, a principal can be bound by the agent's actions. *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 830 (8th Cir. 1992). "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* (quoting Restatement (Second) of Agency § 27

39

(1957)). *See also* Restatement (Third) of Agency § 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.").

In *GP3 II, LLC v. Litong Cap., LLC*, 35 F.4th 1124, 1127–28 (8th Cir. 2022), the Eighth Circuit Court of Appeals addressed whether an individual could bind a non-signatory to an arbitration agreement under the doctrine of apparent authority. According to the Eighth Circuit:

> "[A]pparent authority is created by the conduct of the principal which causes a third person reasonably to believe that the purported agent has the authority to act for the principal, and to reasonably and in good faith rely on the authority held out by the principal." *Essco Geometric v. Harvard Indus.*, 46 F.3d 718, 726 (8th Cir. 1995) (citations omitted); *accord Starr v. Jackson Cnty. Prosecuting Att'y*, 635 S.W.3d 185, 190 (Mo. Ct. App. 2021). Because apparent authority is about the manifest intent of the principal, it "does not arise from the acts of the agent." *Essco Geometric*, 46 F.3d at 726; *accord Gauert v. Chris-Leef Gen. Agency, Inc.*, 123 S.W.3d 270, 273 (Mo. Ct. App. 2003). To create apparent authority by acquiescence of the principal, the principal must know of and acquiesce to the acts of the agent. *See Hamilton Hauling, Inc. v. GAF Corp.*, 719 S.W.2d 841, 848 (Mo. Ct. App. 1986). Also, apparent authority *"must be based on facts that exist at the time of the transaction and may not be based on facts that arise later." Gauert*, 123 S.W.3d at 273.

*Id.* at 1127-28 (emphasis added).

In the case, the Eighth Circuit affirmed the district court's finding that the proponent of enforcing the arbitration agreement had not carried its burden and established that the signatory had apparent authority to enter the contract on behalf

of the non-signatory because in support of its position it was relying on (1) the signatory's conduct and not the conduct of the principal; and (2) conduct that occurred after the contract was signed.    *Id.* at 1128. ("[the signatory]'s representations could not have established [the alleged principal]'s apparent authority because apparent authority arises 'solely from the acts of the alleged principal.'") (quoting *Gauert*, 123 S.W.3d at 273)).

BNSF does not cite *GP3 II, LLC* in support of its argument for the application of apparent authority in this dispute, but rather it cites cases from an outside circuit and different districts that applied law from states that do not appear to be connected to these five defendants.  *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380, 382 (4th Cir. 2024) (applying Maryland law); *Durham v. Airbnb, Inc.*, No. CV SAG-24-02523, 2025 WL 675319 (D. Md. Mar. 3, 2025) (applying California law); *Jackson v. World Wrestling Ent., Inc.*, No. 4:23-CV-0172-P, 2023 WL 3326115, at \*3–\*4 (N.D. Tex. May 9, 2023), *aff'd,* 95 F.4th 390 (5th Cir. 2024) (applying Texas law).[7]

In the three cases BNSF cites, the parties against whom arbitration was sought had not purchased their own tickets or made the reservations, instead a friend or

---

[7]BNSF does cite to *Missouri Pacific. Railroad Co. v. Prude*, 265 U.S. 99 (1924), a United States Supreme Court case. The case, however, is not dispositive as to these five defendants, because the party seeking to avoid the terms of the contract had purchased the ticket herself, and the case does not address whether a party can be held to the terms of a contract when the ticket was purchased by someone else. *Id.* BNSF also cites to *Coleman v. Norwegian Cruise Lines*, 753 F. Supp. 1490, 1492 (W.D. Mo. 1991), which is likewise factually distinguishable and not dispositive. *Coleman* was decided under a federal admiralty statute, and the plaintiff seeking to avoid a term in the contract had purchased her own ticket from her travel agent.

family member conducted the purchase transactions online and, for those cases involving tickets, the friend or family member had presented the tickets at the event. The three courts held that the arbitration provisions could be enforced against individuals whose tickets were purchased online by a friend or family member based on the doctrine of agency and apparent authority. *Naimoli*, 120 F.4th at 387; *Durham*, 2025 WL 675319, at *3; *Jackson*; 2023 WL 3326115, at *4. For example, in *Naimoli*, the Fourth Circuit found there was apparent authority to bind those who had not purchased their own tickets, because "it was reasonable for the Washington Football Team to assume that in purchasing nine tickets, [the purchaser] did so both for himself and for the plaintiffs, as indicated by the purchase of multiple tickets and the plaintiffs' entry into the stadium by means of those tickets." *Naimoli*, 120 F.4th at 387 at 387–88. The Fourth Circuit further found the football team's reliance was traceable to the plaintiffs' conduct because they used the tickets to enter the stadium. *Id.* at 388. *See also Durham*, 2025 WL 675319, at *3 ("Defendant] relied on [the friend]'s apparent authority to act on behalf of her rental party in renting a house in which they would all stay, using Airbnb's [terms of service]. The nine-person rental party, including Plaintiff, arrived and stayed at the Premises, manifesting their acceptance to the contract terms.").

The Court finds that the authority BNSF cites is neither persuasive nor controlling. As stated above, the cases are from an outside circuit and different

42

districts that applied law from states that do not appear to be connected to these five defendants.  Further, in reaching their conclusions that the doctrine of apparent authority applied, these courts relied on conduct of the purported agent and not the conduct of the principal, (*e.g.*, the fact that the friend or family member bought multiple tickets or reserved a house for multiple people), as well as conduct that occurred after the contracts were signed, (*e.g.,* the fact that the supposed principals entered the event on the purchased tickets or stayed at the rental property). The Eighth Circuit has instructed that apparent authority arises from the acts of the alleged principal and must be based on conduct that occurred prior to when the contract was formed. *GP3 II, LLC*, 35 F.4th at 1127–28 (reversing district court finding of apparent authority that had relied on (1) the signatory's conduct and (2) conduct that occurred after contract was signed).  The Court finds that under the facts of this case, the doctrine of apparent authority is not applicable to these five defendants.

Nevertheless, the Court finds that Defendants Magin, Powers, Boyd, Sanborn, and Disciacca are subject to the Arbitration Agreement under a different principle of agency. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *State ex rel. Ford Motor Co. v. Bacon*, 63 S.W.3d 641, 642 (Mo. 2002) (quoting Restatement (Second) of Agency § 1

43

(1958). More simply, "an agency relationship exists when one person is authorized to represent and act for another in dealings with third parties." *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 378 (Mo. Ct. App. 2014) (quoting 2A C.J.S., Agency § 1).  These five defendants all attest that they did not authorize their friend or co-worker, who purchased their train tickets, to agree to an arbitration clause, but they do not disclaim the fact that they did authorize these individuals to purchase a train ticket on their behalf.  In other words, the five defendants make no claim that the ticket purchases were unauthorized or fraudulent.  Further, it is undisputed that all five of these defendants used tickets purchased on their behalf to board the train.

Construing the facts in favor of the five defendants, the Court finds that the individuals who purchased tickets on behalf of these five defendants were authorized to purchase the train tickets, but they overstepped their authority when they clicked the box and agreed to the Arbitration Agreement. Although the online ticket purchases were unauthorized at the time, in that the agents overstepped their authority, the five defendants later voluntarily accepted the benefit of the transactions by using the tickets and boarding the train.  Based on the record before it, the Court finds the five defendants ratified a contract when they boarded the train, which included the Arbitration Agreement.

"Ratification is an adoption or confirmation upon full knowledge of the facts by one entity of an act (such as entering into a contract) performed on that entity's

behalf by another without authority." *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1, 9 (Mo. Ct. App. 2002). "Ratification relates back and is the equivalent of authority at the commencement of the act." *Newman v. Schiff*, 778 F.2d 460, 467 (8th Cir. 1985). "'Probably the most certain evidence of implied ratification is the acceptance and retention of the fruits of the contract with full knowledge of the material facts of the transaction.'" *Carter*, 88 S.W.3d at 9 (quoting *Am. Multi-Cinema, Inc. v. Talayna's N.W., Inc.*, 848 S.W.2d 557, 560 (Mo. Ct. App. 1993)).

Here, these five defendants all knew at some point before boarding Train 4 that a friend or co-worker had purchased Amtrak tickets for them online. The five defendants did not disavow the transactions that resulted in the purchase of the tickets, but rather they ratified or acquiesced to the purchase transactions by boarding the train and accepting the benefit of the bargains their unauthorized agents had obtained. *Id.* Further, the five defendants ratified the whole contract as agreed to by the individuals who purchased the tickets. "[O]ne who ratifies an act done in his name without previous authority must ratify it as done, and he cannot accept in part, and reject in part…. Consequently, if he sees fit to adopt an unauthorized act at all, he must adopt it as a whole, and in its entirety." *Barrow v. Booneville No. 1, Inc.*, 31 S.W.3d 90, 94 (Mo. Ct. App. 2000). *See also Restatement (Third) of Agency* § 4.07 (2006) (no partial ratification – "[a] person may not, by ratifying an act, obtain its economic benefits without bearing the legal consequences that accompany the

45

act."); *NORCAL Dubail v. Med. W. Bldg. Corp.*, 372 S.W.2d 128, 132 (Mo. 1963) ("[B]y accepting benefits a person may be estopped from questioning the existence, validity, and effect of a contract. A party will not be allowed to assume the inconsistent position of affirming a contract in part by accepting or claiming its benefits, and disaffirming it in part by repudiating or avoiding its obligations, or burdens."); *accord Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 81, 100 Cal. Rptr. 2d 683, 697 (2000) ("[A] principal is not allowed to ratify the unauthorized acts of an agent to the extent that they are beneficial, and disavow them to the extent that they are damaging. If a principal ratifies part of a transaction, he is deemed to ratify the whole of it."); *Norcal Mut. Ins. Co. v. Newton*, 100 Cal.Rptr.2d 683, 697 (Cal. App. 2000) ("Accepting the benefit of coverage under an insurance policy by ratifying a settlement agreement binds the principal to the policy's arbitration clause."). To the extent the defendants' friend or co-worker exceeded their authority by purchasing the defendants' Amtrak tickets online and clicking the box agreeing to arbitration, the five defendants did not repudiate the purchase agreements, instead they ratified the ticket purchase agreements on whole, which includes the arbitration provision.

The Court finds a friend or co-worker of Defendants Magin, Powers, Boyd, Sanborn, and Disciacca purchased tickets online on behalf of the five defendants, and in doing so, they clicked the box agreeing to Amtrak's Arbitration Agreement.

46

And while the friends and co-worker exceeded their authority by agreeing to arbitration, the Court further finds that Defendants Magin, Powers, Boyd, Sanborn, and Disciacca ratified the contracts made between their friend or co-worker and Amtrak by accepting the tickets and boarding the train, and therefore, these five defendants have assented to all terms of the ticket purchase agreement, including Amtrak's Arbitration Agreement.

c. *Defendant Burkett consented to the Arbitration Agreement*

It is undisputed that Wendy Burkett was on Train 4 when it derailed, but it is unclear from the record who purchased her ticket. BNSF submitted evidence of a document showing that a train ticket for Wendy Burkett was purchased through Amtrak's mobile app, and the email supplied during the online transaction was that of Wendy Burkett, which is where the email receipt was sent. For her part, Wendy Burkett submitted an affidavit stating that she does not recall using the internet to purchase her train ticket, but she did not attest as to how it was purchased or who purchased her ticket.

Based on the record, the Court must conclude either Wendy Burkett or another individual on her behalf purchased her ticket on the mobile app. If Wendy Burkett purchased her own ticket, she would have been required to click the box indicating that she agreed to Amtrak's Terms and Conditions, including the Arbitration Agreement, and the Arbitration Agreement would be enforceable against her. *Segal*,

47

763 F. Supp. 2d 1367 (enforcing clickwrap agreement under Florida law).  If an individual purchased a ticket online on Wendy Burkett's behalf, they also would have been required to click the box indicating they agreed to Amtrak's Terms and Conditions, including the Arbitration Agreement, and the preceding subsection applies.  If another individual purchased Wendy Burkett's ticket and in doing so exceeding his or her authority by clicking the box agreeing to arbitration, Wendy Burkett later ratified the agreement, including the Arbitration Agreement, by using the ticket to board the train.  In either event, Ms.  Burkett has consented to Amtrak's Arbitration Agreement.

> d. *Defendants whose tickets were purchased over the phone by someone else, and no email receipt was sent did not agree to arbitration – the Awe Defendants.*

The Awe Defendants also did not purchase their own tickets, but their tickets were not purchased over the internet, instead, they were purchased over the phone. Craig Thoms called an Amtrak ticketing agent to purchase these train tickets. During the call, Mr. Thoms provided his credit card number.  At no time during the phone call was Mr. Thoms informed about Amtrak's Arbitration Agreement.  Following the phone call, Amtrak sent Mr. Thoms a confirmation letter through the mail.  The letter stated that transportation on Amtrak "is subject to the terms and conditions on your ticket and associated ticket jacket," and that "additional terms and travel

48

information can be found on Amtrak com." (ECF No. 230 at 11).  The confirmation letter did not mention Amtrak's Arbitration Agreement.

In June 2022, prior to the trip, Mr. Thoms received by mail one ticket and one ticket jacket for the group.  The ticket jacket stated in very small typeface, "This ticket is a contract of carriage between Amtrak and the ticket holder which is subject to specific terms and conditions. Those terms and conditions are available for inspection at Amtrak ticket counters or on the Amtrak Web site at www.amtrak.com, or may be requested by calling 1-800-USA-RAIL."  (ECF No. 251, Ex. 4 at 16). The ticket and ticket jacket did not reference Amtrak's Arbitration Agreement.

Under Wisconsin common law, the essential elements of contract are offer, acceptance, and consideration.[8] *Runzheimer Int'l v. Friedlen*, 862 N.W.2d 879, 885 (Wis. 2015). "The existence of an offer and acceptance are mutual expressions of assent, and consideration is evidence of the intent to be bound to the contract." *Id.* (citation omitted).  For there to be a contract, Wisconsin law requires "a meeting of the minds, a factual condition that can be demonstrated by word or deed." *Wells Fargo Bus. Credit v. Hindman*, 734 F.3d 657, 667 (7th Cir. 2013) (applying Wisconsin law).  "A contract includes only the terms on which the parties have

---

[8]The Awe Defendants contend that Wisconsin law applies to whether they formed a contract for arbitration.  The Awe Defendants are from Wisconsin, Mr. Thoms placed the call in Wisconsin, and the tickets were mailed there as well.  BNSF argues that the Court need not do a choice of law analysis because Missouri law and Wisconsin law are the same, but it does not oppose the application of Wisconsin law.  The Court will apply Wisconsin law to the Awe Defendants.

agreed. One cannot agree to hidden terms[.]" *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1450 (7th Cir. 1996) (applying Wisconsin law).

In support of its motion to compel arbitration, BNSF makes the same arguments with regard to the Awe Defendants as it did for the five defendants whose tickets were purchased by a friend of co-worker over the internet.  Citing the same cases, BNSF argues that Mr. Thoms had apparent authority to purchase tickets on behalf of the Awe Defendants and, therefore, the Awe Defendants are bound by Amtrak's Arbitration Agreement.  Further, BNSF argues that the Awe Defendants boarded the train, and use of a ticket to travel on a common carrier "constitutes formation of a contract between the entity issuing the ticket and the individual using the ticket." *Missouri Pac. R. Co.*, 265 U.S. 99.

Again, the Court does not find BNSF's arguments to be persuasive.  There are no facts in the record from which one could conclude that *the Awe Defendants' conduct* led Amtrak to reasonably believe that Mr. Thoms had the authority to act on their behalf.  Amtrak had no contact with the Awe Defendants whatsoever until the day they traveled.  The controlling principle is not apparent authority, but rather ratification. The Court must determine whether Mr. Thoms entered into a contract with Amtrak, what the terms of the contract were, and whether the Awe Defendants ratified or otherwise accepted that contract.

50

Mr. Thoms entered in a contract with Amtrak because he purchased train tickets, but what is less clear are the contract's terms, and whether they included the Arbitration Agreement.  An offer with terms ordinarily comes before acceptance, but here there is no evidence that the Arbitration Agreement was discussed with Mr. Thoms when he purchased the tickets over the phone.  Unlike ticket purchases that were made over the internet, where users were required to click a box and agree to Amtrak's Terms and Conditions and the Arbitration Agreement before the ticket purchases were made, the evidence does not support a finding that Mr. Thoms assented to the Arbitration Agreement when he made the phone purchase.  The issue, therefore, is whether Mr. Thoms assented to the Arbitration Agreement after he purchased the train tickets, (e.g., it was a money-now-terms-later contract), or if the contract was modified after Mr. Thoms purchased the tickets.

Consumer contracts where the exchange of money precedes the communication of detailed terms are increasingly common and can be enforced under certain circumstances.  In *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996), a software company brought suit against users for violation of its license agreement.  The defendant users had purchased the software at a retail store in a box, the outside of which "declared that the software comes with restrictions stated in an enclosed license." *Id.* at 1450.  The lower court ruled that the license agreement was ineffectual because its terms did not appear on the outside of the box and, therefore,

51

the users had not assented to the terms when they made their purchases.  *ProCD, Inc. v. Zeidenberg*, 908 F. Supp. 640, 655 (W.D. Wis. 1996) ("because defendants did not have the opportunity to bargain or object to the proposed user agreement or even review it before purchase and they did not assent to the terms explicitly after they learned of them, they are not bound by the user agreement.").

Applying Wisconsin law, the Court of Appeals for the Seventh Circuit disagreed and reversed.  It found that parties can form a contract where one of the terms of the contract is that more detailed terms will follow.  *Id.* at 1451.  Under the facts of the case, there was notice on the outside of the box that the purchase was subject to a license; the terms of the license were inside the box; and the purchaser had a right to return the software for a refund if the terms were unacceptable, but use of the software constituted acceptance of the terms. According to the Seventh Circuit:

> A vendor, as master of the offer, may invite acceptance by conduct, and may propose limitations on the kind of conduct that constitutes acceptance. A buyer may accept by performing the acts the vendor proposes to treat as acceptance. And that is what happened. ProCD proposed a contract that a buyer would accept by *using* the software after having an opportunity to read the license at leisure.

*Id.* at 1452.

While *ProCD* is instructive, it is legally and factually distinguishable from the case here.  The case is legally distinguishable, because it was decided under Wisconsin's version of the Uniform Commercial Code ("U.C.C.") – a statute that

52

only applies to the sale of goods. *Marquette Univ. v. Kuali, Inc.*, 584 F. Supp. 3d 720, 723–24 (E.D. Wis. 2022) (citing Wis. Stat. § 402.105(1)(c)). That said, much of the reasoning in *ProCD* was based on general principles of contract law and was not specific to the U.C.C.  The facts here are wholly distinguishable from *ProCD* on two dispositive points.

First, the buyers in *ProCD* had notice that the purchase came with more terms and conditions that were contained inside the box.  BNSF has not established that Amtrak Mr. Thoms agreed to over the phone that more detailed terms would follow after the purchase of the tickets. More specifically, there is no evidence in the record that Mr. Thoms was told that the tickets would be subject to terms and conditions, including an arbitration agreement, when he made the ticket purchase on the phone, and that he must assent to those terms or return the tickets. Second, in *ProCD*, the license was included in the box.  It was encoded on the CD–ROM disks, printed in the manual, and appeared on a user's screen every time the software ran.  The software would not let a user proceed without indicating acceptance of the license. *Id.* at 1452–53.  In short, it was "unavoidable." *Id.*  Here, Amtrak did not provide Mr. Thoms, or any of the Awe Defendants, with a copy of its Terms and Conditions that contained the Arbitration Agreement.   The Arbitration Agreement is not enforceable under the reasoning in *ProCD, Inc.*

53

The Court now turns to whether Mr. Thoms or the Awe Defendants later assented to the Arbitration Agreement as a modification to the contract between Mr. Thoms and Amtrak.  A contract can be modified by the subsequent agreement of the parties. *Lakeshore Com. Fin. Corp. v. Drobac*, 107 Wis. 2d 445, 319 N.W.2d 839, 845 (1982).  Here, there is no evidence that Mr. Thoms agreed to the Arbitration Agreement in writing or verbally.  But under Wisconsin law, "[a]n assent or acceptance of a contract offer can be manifested by deed as well as by word." *Hoffman v. Ralston Purina Co.*, 86 Wis. 2d 445, 273 N.W.2d 214 (1979).  BNSF would argue that Mr. Thoms and the Awe Defendants boarded the train, and boarding the train was assent to the Arbitration Agreement.

Conduct manifesting assent may be silence and action, such as boarding a train without objecting to a term, but "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." Restatement (Second) of Contracts § 19(2). Courts have recognized acceptance of a benefit as assent, but the validity of the assent hinges on knowledge of the terms. *See*, e.g., *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 429 (2d Cir. 2004) ("The acceptance of a benefit "may constitute assent, but only where the 'offeree makes a

54

decision to take the benefit with knowledge [actual or constructive] of the terms of the offer....'").

In cases where the purported assent is largely passive, "the contract-formation question will often turn on whether a reasonably prudent offeree would be on notice of the term at issue." *Id.* "'[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.'" *Id.* (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993, 101 Cal. Rptr. 347 (Ct. App. 1972)). *See also Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023) ("Mutual assent requires, at a minimum, that the party relying on the contractual provision establish that the other party had notice and gave some indication of assent to the contract.").

In *Lewandowski v. Megabus USA, LLC*, 613 F. Supp. 3d 909, 911 (W.D. Pa. 2020), a case that is nearly on all fours with the case here, the plaintiff argued that she was not bound by the terms of an arbitration agreement because she was never presented with its terms, she did not review them, and she did not manifest an intention to be bound by them. The plaintiff bought tickets over the phone to ride the Megabus. Each time the plaintiff purchased a ticket, the ticketing agent informed her that the ticket was subject to applicable terms, and when she asked what the terms were and where she could locate them, the agent told her that she could look

online at Megabus's website for the full terms and conditions. *Id.* at 914. "No ticketing agent ever told Plaintiff that her purchase may be subject to an arbitration agreement, much less recite the terms to her." *Id.*

The court held that the plaintiff had never agreed to the arbitration agreement, and she could not be compelled to arbitrate. *Id.* at 915. It found that plaintiff's use of the ticket did not manifest assent to the arbitration agreement where the terms of the agreement "were only available for review on a separate medium" and where "the transaction could be completed without requiring her to acknowledge review of the clause and express assent to its terms." *Id.* The court concluded that the plaintiff "did not agree, through words or deeds, to arbitrate her dispute with Megabus," and she could not be compelled to do so. *Id. See also James v. Glob. TelLink Corp*, 852 F.3d 262, 267 (3d Cir. 2017) (declining to find assent to arbitration agreement where services were offered on the telephone, but the terms of the agreement were available only online); *Burgess v. Qwest Corp.*, 546 F. Supp. 2d 1117, 1122 (D. Or. 2008) (finding plaintiff, who had enrolled in and activated cell phone service by telephone, had not agreed to an arbitration clause in the wireless phone agreement). *Compare Zean v. Comcast Broadband Sec., LLC*, 322 F. Supp. 3d 913, 918 (D. Minn. 2018) (finding plaintiff's use of internet services constituted assent to terms of arbitration agreement when conversation on the phone was followed by installation and plaintiff received a hard copy of the terms of service); *Lenfest v. Verizon Enter. Sols., LLC*,

56

52 F. Supp. 3d 259, 263 (D. Mass. 2014) (enforcing arbitration agreement where on the phone plaintiff orally agreed to assume the outstanding charges and bind himself to the present terms and conditions of the account, and defendant then sent him a copy of the service agreement, which contained the arbitration provision).

Based on the record before it, the Court finds that Mr. Thoms did not assent to Amtrak's Arbitration Agreement because Amtrak failed to provide him with adequate notice of its terms.  There is no evidence that Mr. Thoms knew of the Arbitration Agreement.  As for whether he should have known, the Court finds that Amtrak did not provide sufficient notice such that a reasonable person would have known that assent to the Arbitration Agreement could be inferred by using the ticket. On the phone, the ticketing agent did not inform Mr. Thoms that assent to an arbitration agreement was a condition for use of the ticket.  Further the Arbitration Agreement was not mentioned in the confirmation letter Mr. Thoms received in the mail, and it was not on the ticket jacket.  Amtrak effectively hid the location of its Terms and Conditions and the Arbitration Agreement, which were located in separate media, in very small print on the ticket jacket.[9]

---

[9]Even if Mr. Thoms had read the text on the ticket jacket and went to look for the terms and conditions online, entering the internet address Amtrak provided on the ticket jacket would not have taken him directly to Amtrak's Terms and Conditions and/or Arbitration Agreement. The internet address provided on the ticket jacket was for Amtrak's main webpage. To locate the terms and conditions, Mr. Thoms would have been required to scroll through Amtrak's main webpage to find a small hyperlink, listed among other hyperlinks, at the very bottom of the webpage. Hovering over the words "Terms and Conditions" would have revealed that it was a hyperlink,

Had Amtrak printed its Terms and Conditions on the ticket jacket or indicated on the ticket or ticket jacket that it was subject to an arbitration agreement, assent to the Arbitration Agreement might be inferred from use of the ticket.  For example, in the 1924 Supreme Court case upon which BNSF places so much reliance, *Missouri Pacific Railroad Company v. Prude*, the terms the railroad sought to enforce were printed on the ticket itself.  265 U.S. 99, 101 (1924).  In its one-page opinion, the Supreme Court held that "[a]cceptance and use of the ticket sufficed to establish an agreement, *prima facie* valid, which limited the selling carrier's liability" and "[m]ere failure of the passenger *to read matter plainly placed before her cannot overcome the presumption of assent.*" *Id.* (emphasis added).  *See also Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 591 (1991) (enforcing under federal admiralty law a forum selection clause *that was printed on the ticket*).  The Court has found no case that has enforced an arbitration agreement under facts that are analogous to the case here, and BNSF has cited none.

In sum, Mr. Thoms entered into a contract with Amtrak for the purchase of tickets, but the Court, for all the foregoing reasons, cannot conclude that Mr. Thoms assented to the Arbitration Agreement, as Amtrak did not provide him with sufficient notice such that a reasonable person would have known the tickets were subject to

---

and clicking on the words would have taken him to another webpage that set forth the Terms and Conditions, including the Arbitration Agreement.

an arbitration agreement. *Schnabel*, 697 F.3d at 120; *Lewandowski*, 613 F. Supp. 3d at 911. Amtrak's Terms and Conditions were not printed on the ticket or ticket jacket, and the fact there was an arbitration agreement was not communicated to Mr. Thoms in Amtrak's written and oral communications with him. In light of the foregoing review and discussion, the Court cannot find that the Awe Defendants ratified the Arbitration Agreement when they boarded the train. Further, the facts do not support a finding that the Awe Defendnats otherwise assented to the Arbitration Agreement.

> e.   *Defendants who purchased tickets over the phone and an email receipt was sent did agree to arbitration – Defendants Juarez-Mora and A.J.M.*

It is undisputed that Susan Juarez-Mora also purchased her ticket and a ticket for her minor daughter, A.J.M., over the phone. There is no evidence that Susan Juarez-Mora was notified at the time she purchased the tickets about Amtrak's Terms and Conditions, and more specifically, that there was an arbitration agreement. During the telephone call, Ms. Juarez-Mora did provide Amtrak with her personal email address, and following the purchase over the phone, Amtrak sent Ms. Juarez-Mora an e-mail receipt to the email address that she provided. The email stated the following:

> This ticket is a contract of carriage which includes specific terms and conditions and a binding arbitration agreement between Amtrak and the ticket builder. The terms and conditions and arbitration agreement are available at Amtrak.com/terms-and-conditions.html.

(ECF No. 230, Ex. 27 at 6).  This information was in the same-sized font as other information in the email.  Further, the website address was written in blue, was underlined, and it contained a direct link to the Terms and Conditions on Amtrak's website.  If a purchaser clicked and followed the online link to Amtrak's Terms and Conditions, on the very top of the webpage, it stated that the Terms and Conditions contain a binding Arbitration Agreement.  Ms. Juarez-Mora and her daughter used their tickets and boarded the train without reading Amtrak's Terms and Conditions.

Amtrak drew attention to its Arbitration Agreement when it communicated with Ms. Juarez-Mora. The Arbitration Agreement was clearly referenced in the confirmation email sent to her email address, and Amtrak provided an internet link that went directly to a webpage with Amtrak's Terms and Conditions, where it plainly and conspicuously stated that the tickets were subject to the Arbitration Agreement.  As to Ms. Juarez-Mora and her daughter, the Court finds Amtrak presented the Terms and Conditions of the tickets with sufficient notice such that a reasonable person should have been aware of them, including the fact that the tickets were subject to the Arbitration Agreement, and that the use of the tickets by Ms. Juarez-Mora and her daughter establishes assent to the Arbitration Agreement. *Edmondson v. German Am. Bank*, 748 F. Supp. 3d 621, 628 (S.D. Ind. 2024) (finding plaintiffs had assented to an arbitration agreement where they had received notice of the agreement in the mail, and they used the services provided by their new account);

60

*Rendon v. T-Mobile USA, Inc.*, 747 F. Supp. 3d 1314, 1319 (C.D. Cal. 2024), *reconsideration denied,* No. 2:24-CV-01666-FLA (KSX), 2024 WL 5256491 (C.D. Cal. Nov. 4, 2024) (finding assent where company sent e-mail to consumer that included links to full terms and conditions); *Zean*, 322 F. Supp. 3d at 918 (assent found where conversation on the phone was followed by receipt of a hard copy of the terms of service); *Lenfest*, 52 F. Supp. 3d at 263 (same).

> ### f. Defendant Covington consented to the Arbitration Agreement.

Todd Covington was a passenger on Train 4, but the parties dispute how he purchased his ticket. Todd Covington points to evidence that he purchased his ticket over the phone. BNSF disputes this fact, (ECF No. 280 at 94), and has produced a document that it contends demonstrates that Todd Covington purchased his ticket over the internet and that during the online transaction, he clicked a box accepting Amtrak's Terms and Condition, including the Arbitration Agreement. Both sides do agree that Amtrak sent Todd Covington an e-mail receipt to the email address that he supplied. The email receipt provided the same information in the same manner as set forth in the preceding subsection. Todd Covington used his ticket and boarded the train without reading Amtrak's Terms and Conditions.

Under either side's version of the facts, Todd Covington assented to Amtrak's Arbitration Agreement. If the ticket was purchased over the internet, to complete the purchase, he would have been required to click on the box indicating he agreed

61

to Amtrak's Terms and Conditions, including the Arbitration Agreement.  This is an enforceable clickwrap agreement.  *Wakeman*, 721 F. Supp. 3d at 1196; *Perficient, Inc.*, 2022 WL 1102117, at *5.  And if Mr. Covington purchased his ticket over the phone and he received the email receipt, a fact that he does not dispute, then Amtrak presented the Terms and Conditions of the ticket with sufficient notice such that a reasonable person should have been aware of them, and his use of the ticket establishes assent to the Arbitration Agreement. *Rendon*, 747 F. Supp. 3d at 1319; *Zean*, 322 F. Supp. 3d at 918; *Lenfest*, 52 F. Supp. 3d at 263.

g.  *N.N.'s mother may consent to arbitration on his behalf.*

N.N. is the minor son of Defendant Salazar.  It is undisputed that Ms. Salazar purchased N.N.'s train ticket over the internet, and that she clicked the box indicating she agreed to Amtrak's Terms and Conditions, including the Arbitration Agreement.  It is also undisputed that both Ms. Salazar and N.N. used these tickets to board the train.

N.N. argues that it has not been established that his mother had authority to act on his behalf. Quoting *Hoffmann v. Young*, 13 Cal. 5th 1257, 515 P.3d 635, 646 (2022), N.N. argues that "the mere existence of a parent-child relationship does not create an agency."[10] (ECF No. 247 at 11).  *Hoffman*, however, is not applicable,

---

[10]Defendant N.N. argues that he is a resident of California and, therefore, California law applies.  BNSF does not oppose the application of California law to N.N.'s argument.

62

because the issue in the case was not whether a parent acts as an agent for his or her child and has the authority to bind a child, but rather whether a child can act as an agent of his or her parents and can bind the parents. 515 P.3d at 646.

Here, N.N. did not agree to the Arbitration Agreement, his mother did on his behalf, and under California law, a parent may contract on a child's behalf. *Doyle v. Giuliucci*, 62 Cal. 2d 606, 608, 401 P.2d 1 (1965). California law does allow, under certain circumstances, a minor to disavow a contract, *see* Cal. Fam. Code § 6700, but courts in California "have held that the right to disaffirm a minor's contract does not extend to a release of liability signed by a parent on behalf of the minor." *Eriksson v. Nunnink*, 233 Cal. App. 4th 708, 721, 183 Cal. Rptr. 3d 234 (2015). *See also Aaris v. Las Virgenes Unified Sch. Dist.*, 64 Cal. App. 4th 1112, 1120, 75 Cal. Rptr. 2d 801 (1998) ("It is well established that a parent may execute a release on behalf of his or her child."). Further, California courts have extended this exclusion to arbitration agreements. *See Beverly v. Sabo Eventing LLC*, No. G064913, 2026 WL 366449, at *5 (Cal. Ct. App. Feb. 10, 2026) (refusing to allow a minor to disavow an arbitration agreement signed by a parent on her behalf). The Court declines to allow N.N. to disavow Amtrak's Arbitration Agreement, which his mother legally entered on his behalf.

     h. *Summary as to who consented to the Arbitration Agreement.*

63

Based on the record before it, the Court concludes that the Awe Defendants – Jonathan Awe, Elijah Awe, I.A., Julian Boardman, and Harrison Boardman – did not ratify or agree to the Amtrak Arbitration Agreement. BNSF cannot enforce the Amtrak Agreement against these five defendants, and the Court will enter summary judgment in their favor. The Court grants the Awe Defendant's Motion for Summary Judgment. The Court further finds that the evidence in the record establishes that the Powers Defendants – Tiffany Powers, Pauline Magin, N.N., Ruth Sanborn, Dustin Boyd, Joseph Disciacca, Todd Covington, Wendy Burkett, Susan Juarez-Mora, and A.J.M – and Defendants Angelika Salazar Pierson Beaulieu, Nicolas Dehoyos, and Kimberly Howard have consented to Amtrak's Arbitration Agreement. The Court finds these defendants agreed to arbitrate their claims against BNSF, and the Court denies the Powers Defendants' Motion for Summary Judgment.

The Court now turns to Defendants' Motion for Summary Judgment on Invalidity of Delegation Clause and Unconstitutionality of Arbitration Provision. (ECF No. 250).

64

**D. The Delegation Provision in the Arbitration Agreement Is Enforceable.**

In moving for summary judgment, all the remaining defendants contend that Amtrak is a governmental entity and, therefore, its conduct must comport with the United States Constitution.  Defendants argue that "[t]hree federal constitutional rights prevent Amtrak from validly requiring arbitration in order to use its services." (ECF No. 201 at 24).  They argue Amtrak's Arbitration Agreement burdens the constitutional guarantee of access to the courts and right to trial by jury and, in addition, it impinges on the right to travel.  Defendants further argue that the unconstitutional condition doctrine applies in that the government, which they contend is Amtrak, may not deny a benefit based on the fact that a person exercised a constitutional right.  Defendants assert that Amtrak's Arbitration Agreement impermissibly conditions the purchase of train tickets on waiving constitutional rights. Defendants also argue that Amtrak's Arbitration Agreement does not comport with the separation of powers because Congress did not authorize Amtrak to condition the purchase of a train ticket on agreeing to arbitration.  Finally, Defendants argue that the Arbitration Agreement cannot be reconciled with Equal Protection under the Fifth Amendment because Amtrak is offering passenger tickets on different terms.

BNSF responds that these are "gateway" issues that go to the issue of the validity or enforceability of the agreement, and because the Arbitration Agreement

65

contains a delegation provision, the constitutional issues Defendants raise are to be determined by the arbitrator and not the Court.  Defendants reply that language in the Arbitration Agreement is ambiguous such that the purported delegation provision is not enforceable.  In the alternative, Defendants argue that an arbitrator lacks the authority to decide constitutional issues.  The Court will first address whether there is an enforceable delegation provision in the Arbitration Agreement.

Parties to an arbitration agreement can agree to a delegation provision, whereby an arbitrator, rather than a court, will resolve threshold questions of arbitrability. *Shockley v. PrimeLending*, 929 F.3d 1012, 1018 (8th Cir. 2019). "These gateway questions may include determining the validity of the arbitration agreement itself." *Id.* (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010)). "[A] delegation provision is an additional, severable agreement to arbitrate threshold issues that is valid and enforceable unless a specific challenge is levied against the delegation provision." *Id.* (alteration in original) (quoting *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 50 (Mo. banc 2017)). "If not challenged directly, [the Eighth Circuit] presume[s] the delegation provision is valid, and, as a result, antecedent questions such as an arbitration contract's validity will go to the arbitrator." *Id.* (citing *State ex rel. Pinkerton*, 531 S.W.3d at 50). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and

66

unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

The Amtrak Arbitration Agreement contains the following language:

Except with respect to the Class Action Waiver below, the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability and enforceability, unconscionability or waiver of this Arbitration Agreement, including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable.  The Arbitration Agreement is governed by the Federal Arbitration Act ("FAA") and evidences a transaction involving commerce. The arbitration will be conducted before a single arbitrator under Consumer Arbitration Rules of the American Arbitration Association ("AAA"), which are available at the AAA website (www.adr.org).
…

The parties agree to bring any claim or dispute in arbitration on an individual basis only, and not as a class or representative action, and there will be no right or authority for any claim or dispute to be brought, heard or arbitrated as a class or representative action ("Class Action Waiver"). Regardless of anything else in this Arbitration Agreement and/or the applicable AAA Rules, any dispute relating to the interpretation, applicability, enforceability or waiver of the Class Action Waiver may only be determined by a court and not an arbitrator.

(ECF No. 274 at 58)

Defendants do not dispute that these terms are contained within the Arbitration Agreement, but they argue that the language of the these terms creates an ambiguity and, therefore, the purported delegation clause is unenforceable.

In briefs filed with the Court, Defendants characterize the following sentence as the delegation clause:

67

> Except with respect to the Class Action Waiver below, the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, applicability and enforceability, unconscionability or waiver of this Arbitration Agreement, including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable.

And they characterize the following sentence as an "anti-delegation" clause:

> Regardless of anything else in this Arbitration Agreement and/or the applicable AAA Rules, any dispute relating to the interpretation, applicability, enforceability or waiver of the Class Action Waiver may only be determined by a court and not an arbitrator.

Defendants argue that the "anti-delegation" clause overrides and limits the scope of the delegation clause. Defendants further contend that because of the punctuation used in the anti-delegation clause, the terms "interpretation, applicability, enforceability" stand alone and, therefore, they refer to the Arbitration Agreement as a whole.  They argue because an Oxford comma was not used, the term "waiver of the Class Action Waiver" must be read together and, therefore waiver refers to waiver of the Class Action Waiver only.  According to Defendants, "the absence of an Oxford comma, which is present throughout the rest of the Agreement, acts to group 'interpretation,' 'applicability,' and 'enforceability' as subject matter that is withdrawn from the delegation clause and thus assigned to a court.  In contrast, 'waiver' is withdrawn from arbitrator's decision-making only with respect to the Class Action Waiver."  (ECF No. 250, at 11).  In other words, Defendants contend that under the purported delegation clause, the arbitrator is to decide disputes over

68

"the validity, applicability and enforceability, unconscionability or waiver" of the Arbitration Agreement, but that the anti-delegation claim then pulls back and assigns to the courts disputes over the "interpretation, applicability, [and] enforceability" of the Arbitration Agreement, as well as disputes over wavier of the Class Action Waiver.

BNSF responds that the agreement must be read as a whole, and it is clear that "[e]xcept with respect to the Class Action Waiver below," the parties agreed that the arbitrator "shall have exclusive authority to resolve any dispute relating to the validity, applicability and enforceability, unconscionability or waiver *of this Arbitration Agreement.*"  (ECF No. 230, Ex. 5 at 58).   And with respect to the exception for the Class Action Waiver the parties agreed that "any dispute relating to the interpretation, applicability, enforceability or waiver *of the Class Action Waiver* may only be determined by a court and not an arbitrator." (*Id.*)  According to BNSF, under the plain meaning of the agreement between the parties, gateway issues of arbitrability that go to the Arbitration Agreement in general are to be decided by the arbitrator, but issues related to the Class Action Waiver specifically are to be decided by the courts.

"The cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Jacobson Warehouse Co. v. Schnuck Markets, Inc.*, 13 F.4th 659, 669 (8th Cir. 2021) (quoting *Dunn Indus. Grp., Inc. v.*

69

*City of Sugar Creek,* 112 S.W.3d 421, 428 (Mo. 2003)).  "A contract is unambiguous when it 'uses plain and unequivocal language,'" and unambiguous contracts are to be enforced it as written.  *Id.* (quoting *Deal v. Consumer Programs, Inc.*, 470 F.3d 1225, 1230 (8th Cir. 2006)). A contract is ambiguous, "when 'its terms can be genuinely and reasonably construed in more than one way.'" *Id.* (quoting *J.H. Berra Constr. Co. v. City of Washington*, 510 S.W.3d 871, 874 (Mo. Ct. App. 2017)). *See also Dunn Indus. Group, Inc.*, 112 S.W.3d at 428 ("a contract is ambiguous only if its terms are susceptible to fair and honest differences."). The Eighth Circuit has instructed that in order "[t]o determine whether a contract is ambiguous, [a district court must] consider the instrument as a whole, giving the words contained therein their ordinary meaning." *Id.*  "A contract is not ambiguous merely because the parties dispute its meaning." *Id.*

The Court agrees with BNSF that Defendants' proposed interpretation is not supported by the language of the document, and that the Arbitration Agreement, and more specifically, the delegation clause is not ambiguous.  Defendants admit the Arbitration Agreement contains a delegation clause, but they contend that the "anti-delegation" clause pulls from the arbitrator and assigns to the courts the authority to decide disputes over the "interpretation, applicability, [and] enforceability" of the Arbitration Agreement, as well as disputes over waiver of the Class Action Waiver. Defendants support their interpretation by pointing to the fact that the Oxford comma

70

"is present throughout the rest of the Agreement" while it is absent in the "anti-delegation." Defendants are incorrect. The Oxford comma is not used in other portions of the Arbitration Agreement, and most notably, it is not used in the earlier delegation clause, which states, "the arbitrator … shall have exclusive authority to resolve any dispute relating to the validity, applicability and enforceability, unconscionability or waiver of this Arbitration Agreement[.]"

Applying Defendants' reasoning to the general delegation clause, "validity," "applicability and enforceability," and "unconscionability" would be grouped together without a reference to a subject matter, and only "waiver" would be linked with "Arbitration Agreement." Therefore, using the Defendants' reasoning, under the general delegation clause, the arbitrator would decide disputes related to "the validity, applicability and enforceability, [and] unconscionability" and disputes related to the "waiver of this Arbitration Agreement."  Under Defendants' interpretation, a reader is left to wonder: what are disputes relating to "the validity, applicability and enforceability, [and] unconscionability" regarding?  And under Defendant's analysis, they cannot be related to the Arbitration Agreement, because only waiver disputes are linked to the Arbitration Agreement in the general delegation clause.

A similar problem arises under Defendants' interpretation of the anti-delegation clause: if waiver alone is linked to the Class Action Waiver, then what are disputes relating to "the interpretation, applicability, [and] enforceability" regarding?

71

With regard to the "anti-delegation" clause, Defendants fill the gap by arguing disputes relating to "the interpretation, applicability, [and] enforceability" concern the Arbitration Agreement as a whole.  But this interpretation is not supported by the very language of the clause Defendants are challenging – they are inserting a subject matter that is not found in the text – and it is inconsistent with their interpretation of the general delegation clause.

Defendants' interpretation is also untenable because it puts two provisions in the Arbitration Agreement in conflict and renders language in the delegation clause superfluous.  According to Defendants, the general delegation clause explicitly gives arbitrators the exclusive authority to decide the applicability and enforceability of the Arbitration Agreement. However, Defendants argue that the anti-delegation clause takes deciding the applicability and enforceability of the Arbitration Agreement away from the arbitrator and assigns it to the courts.  Contracts should be read as a whole to ensure all terms are harmonized, and it is presumed that no part of a contract should be made superfluous.  *Harris v. The Epoch Grp., L.C.*, 357 F.3d 822, 825 (8th Cir. 2004) ("a contract should be interpreted as to give meaning to all of its terms – presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous.") (quotation and citation omitted).  Courts are to assume that parties do not include terms without a reason. Therefore, a contract should not be interpreted to render parts of it meaningless. Defendants' interpretation

72

would render parts of the delegation clause nugatory, and the Court rejects Defendants interpretation. The Court finds Defendants' interpretation is not reasonable as it is not a fair and honest reading of the contract language.

Use of the Oxford comma is optional in American English, and its absence in these two sentences does not create ambiguity as Defendants suggest.  Elitza Meyer, *It's Not the Oxford Comma, It's the Ambiguity*, 8 HLRe 25, 30 (2017) ("Where the placement or absence of a comma creates no true ambiguity in otherwise clear language or leads to one sensible and one nonsensical interpretation, the courts will not allow the rules surrounding the Oxford comma to guide interpretation."). Delegating disputes "relating to the validity" to the arbitrator is nonsensical without specifying what the arbitrator is to decide is valid or not, as is leaving for the courts to decide "the interpretation" without designating what a court is to interpret.  It is clear from reading the Arbitration Agreement that in the delegation clause "any dispute relating to the validity, applicability and enforceability, unconscionability or waiver" are all in reference to the Arbitration Agreement, and under the exception to the delegation clause, "any dispute relating to the interpretation, applicability, enforceability or waiver" are all in reference to the Class Action Waiver, which is to be determined by a court and not an arbitrator.  The Court makes this finding based on "the plain and ordinary meaning of the words" in the two sentences and

73

"consider[ing] the [Arbitration Agreement] as a whole." *Jacobson Warehouse Co.*, 13 F.4th at 681.

This finding is also consistent with the Arbitration Agreement on the whole, because the parties designated that arbitration shall be conducted under the Consumer Arbitration Rules of the American Arbitration Association ("AAA"). The Eighth Circuit has found an arbitration agreement's "incorporation of the AAA Rules . . . is a clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court." *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009). Indeed, "the AAA Rules empower the arbitrator to determine his or her own jurisdiction over a controversy between the parties." *Kult v. IKO Mfg. Inc.*, No. 4:21-CV-850 RLW, 2022 WL 123787, at *3 (E.D. Mo. Jan. 13, 2022) (citing *Eckert/Wordell Architects, Inc. v. FJM Properties of Wilmar*, LLC, 756 1098, 1100 (8th Cir. 2014)).

In sum, the Court finds that the parties have unambiguously agreed that an arbitrator is to decide any dispute relating to the validity, applicability and enforceability, unconscionability or waiver of the Arbitration Agreement. The only exception to the delegation clause relates to the Class Action Waiver, which is not applicable in this dispute. The Court now turns to whether Defendants' constitutional challenges to the Arbitration Agreement are disputes that fall within the delegation clause and are for the arbitrator to decide.

74

**E. The Parties Have Delegated Disputes Over the Constitutionality of the Arbitration Agreement to the Arbitrator.**

Defendants challenge the constitutionality of Amtrak's Arbitration Agreement. As discussed in more detail above, Defendants contend that BNSF cannot insist on arbitration because enforcement of Amtrak's Arbitration Agreement would require waiver of the constitutional right of access to the courts and right to a jury trial, and according to Defendants, they did not waive these constitutional rights. In addition, Defendants argue that Amtrak's Arbitration Agreement infringes on the constitutional right to travel. Defendants also argue that Amtrak's Arbitration Agreement "cannot be reconciled" with separation of powers and equal protection. (ECF No. 250 at 23-25).

In asserting these constitutional arguments, Defendants are not challenging that a contract was formed.  Rather, Defendants argue that to the extent they have entered into the Arbitration Agreement with Amtrak – and the Court has found that all of the remaining defendants save the Awe Defendants have – the agreement cannot be enforced because it is unconstitutional.  In other words, Defendants' arguments go to the validity or enforceability of the Arbitration Agreement they entered with Amtrak. And as discussed above, the parties agreed that the arbitrator,

75

and not the Court, has exclusive authority over any disputes relating to the validity and enforceability of the Arbitration Agreement.[11]

Defendants maintain that constitutional issues lie outside the authority of an arbitrator, and they cite *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662 (2010). The United States Supreme Court in *Stolt-Nielsen S.A.*, however, did not hold that arbitrators do not have the authority to decide constitutional issues, but rather, it held that when construing an arbitration agreement, it is the parties' intent that controls, and the parties may choose who will decide specific disputes. *Id.* at 682–83.

Under the facts of the case, an arbitration panel had determined that a party to the arbitration agreement at issue, the shipper Stolt-Nielsen S.A., could be compelled to submit to class-action arbitration, although the arbitration agreement was silent on whether it permitted or allowed class arbitration. The Supreme Court found that the arbitration panel had exceeded its powers, because the panel had not based its decision to compel class arbitration on the parties' intent and applicable law, but instead it based its decision on "its own policy choice." *Id.* ("instead of identifying and applying a rule of decision derived from the FAA or either maritime or New

---

[11]To the extent Defendants continue to argue that BNSF has waived arbitration by participating in the state court proceedings in Chariton County, the issue is not for the Court to decide. The parties agreed in the Arbitration Agreement that the arbitrator has exclusive authority over disputes related to the waiver of the agreement. *See* Memorandum and Order dated May 1, 2024. (ECF No. 166 at 14).

York law, the arbitration panel imposed its own policy choice and thus exceeded its powers"). Finding the arbitration panel had exceeded its powers, the Supreme Court ruled that its decision must be vacated under § 10(a)(4) of the FAA. The Court was then left with the decision whether to remand to the arbitration panel and direct a rehearing or to decide the question that was referred to the panel. The Supreme Court saw no need to refer the case back to the panel, "[b]ecause we conclude that there can be only one possible outcome on the facts before us," which was that the parties had not agreed to class-action arbitration. *Id.* at 676.

The Court finds that *Stolt-Nielsen S.A.* supports BNSF's position and not that of the Defendants. In the case, the Supreme Court reiterates that in disputes involving an arbitration agreement, it is the intent of the parties that controls. *Id.* at 682 (citing *Mitubishi Motos Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). Parties to an arbitration agreement "are generally free to structure their arbitration agreement as they see fit," and "they may agree to limit the issues they choose to arbitrate"; they may "agree to rules under which any arbitration will proceed"; and they "may choose who will resolve specific disputes." *Id.* at 683 (cleaned up). *See also Coinbase Inc. v. Suski*, 602 U.S. 143, 149 (2024) (parties to arbitration agreement may agree to have arbitrator decide issues of arbitrability). Here, Defendants argue that the Amtrak Arbitration Agreement is not valid or enforceable because it is unconstitutional. But the parties agreed that the arbitrator,

not the courts, is to decide disputes relating to the validity and enforceability of the Arbitration Agreement, which includes constitutional challenges.  Therefore, an arbitrator will be tasked with "identifying and applying a rule of decision" to the facts to make a determination as to whether the Amtrak Arbitration Agreement is valid and enforceable. *Stolt-Nielsen S.A*, 559 U.S. at 676.  Because Defendants are challenging the Arbitration Agreement on constitutional grounds, the arbitrator likely will be applying federal constitutional law.

As stated above, *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* does not hold that arbitrators do not have the authority to decide constitutional issues. Defendants cite no authority holding arbitrators lack the authority to decide constitutional disputes, and as the Court has found none, the Court must enforce the Arbitration Agreement as the parties intended. The parties agreed that an arbitrator would decide issues of whether the Arbitration Agreement is valid and enforceable, which includes whether it is valid and enforceable under the United States Constitution. Defendants' Motion for Summary Judgment on Invalidity of Delegation Clause and Unconstitutionality of Arbitration Provision is denied.

## IV.   *Conclusion*

In sum, the Court finds that the undisputed evidence establishes that BNSF is an intended, third-party beneficiary that may enforce Amtrak's Arbitration Agreement. The Court further finds that Jonathan Awe, Elijah Awe, I.A., Julian

78

Boardman, and Harrison Boardman did not ratify or agree to the Amtrak Arbitration Agreement. BNSF cannot enforce the Amtrak Agreement against these five defendants. The Court further finds that the evidence in the record establishes that Tiffany Powers, Pauline Magin, N.N., Ruth Sanborn, Dustin Boyd, Joseph Disciacca, Todd Covington, Wendy Burkett, Susan Juarez-Mora, A.J.M, Angelika Salazar, Pierson Beaulieu, Nicolas Dehoyos, and Kimberly Howard have consented to Amtrak's Arbitration Agreement, and BNSF may enforce the Arbitration Agreement against them. The Court directs these 14 defendants to arbitrate their claims against BNSF under the terms of Amtrak's Arbitration Agreement. As the FAA "generally requires a federal district court to stay an action pending an arbitration, rather than to dismiss it," the Court will stay these proceedings as to these 14 defendants pending the outcome of arbitration. *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011) (citing 9 U.S.C. § 3).

Finally, the Court finds that the delegation provision in Amtrak's Arbitration Agreement is not ambiguous, and the parties have delegated to the arbitrator disputes relating to the validity and enforceability of the Arbitration Agreement, which includes whether the Amtrak Arbitration Agreement is valid and enforceable under the United States Constitution.

79

Accordingly,

**IT IS HEREBY ORDERED** that BNSF Railway Company's Motion to Exclude the Opinions of Defendants' Retained Experts Allen Rostron and Jasmine Abdel-Khalik is **GRANTED**.  [ECF No. 242].

**IT IS FURTHER ORDERED** that BNSF Railway Company's Motion for Summary Judgment to compel arbitration is **GRANTED in part and denied in part.** As set forth in this Opinion, Memorandum and Order, BNSF Railway Company's Motion for Summary Judgment to compel arbitration is **GRANTED** as to Defendants Tiffany Powers, Pauline Magin, N.N., Ruth Sanborn, Dustin Boyd, Joseph Disciacca, Todd Covington, Wendy Burkett, Susan Juarez-Mora, A.J.M, Angelika Salazar, Pierson Beaulieu, Nicolas Dehoyos, and Kimberly Howard.  The Court directs these 14 defendants to arbitrate their claims against BNSF Railway Company under the terms of Amtrak's Arbitration Agreement.  In all other respects, the Motion is **DENIED**.  [ECF No. 229].

**IT IS FURTHER ORDERED** that Defendants Jonathan Awe, Elijah Awe, I.A., Harrison Boardman, and Julian Boardman's Motion for Summary Judgment is **GRANTED.** BNSF Railway Company's Complaint to Compel Arbitration is **DISMISSED** as to Defendants Jonathan Awe, Elijah Awe, I.A., Harrison Boardman, and Julian Boardman.  [ECF No. 251]

**IT IS FURTHER ORDERED** that Defendants A.J.M., Dustin Boyd, Wendy Burkett, Todd Covington, Joseph Disciacca, Susan Juarez-Mora, Pauline Magin, N.N., Tiffany Powers, and Ruth Sanborn's Motion for Summary Judgment is **DENIED.**  [ECF No. 247]

**IT IS FURTHER ORDERED** that Defendants A.J.M., Elijah Awe, Jonathan Awe, Pierson Beaulieu, Harrison Boardman, Julian Boardman, Dustin Boyd, Wendy Burkett, Todd Covington, Nicolas Dehoyos, Joseph Disciacca, I.A., Susan Juarez-Mora, Pauline Magin, N.N., Tiffany Powers, Angelika Salazar, and Ruth Sanborn's Motion for Summary Judgment on Invalidity of Delegation Clause and Unconstitutionality of Arbitration Provision is **DENIED.** [ECF No. 250]

**IT IS FURTHER ORDERED** that BNSF Railway Company's Motion for Protective Order is **DENIED as moot.**   [ECF No. 216]

**IT IS FURTHER ORDERED** that BNSF Railway Company's Motion for a Hearing is **DENIED.**  [ECF No. 286]

**IT IS FURTHER ORDERED** that as set forth in this Opinion, Memorandum and Order, this matter is **STAYED** pending arbitration.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall administratively close this cause of action, subject to reopening upon notice by the parties upon the conclusion of the arbitration proceedings.

Dated this 26th day of March, 2026.

_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE